UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THE BROWN PUBLISHING COMPANY
LIQUIDATING TRUST,

                            Appellant,

           -against-

AXA EQUITABLE LIFE INSURANCE
COMPANY,

                         Appellee.
-------------------------------------------------------------X
FEUERSTEIN, J.,

**ORDER**
**13 CV 4651(SJF)**

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ SEP 3 0 2014 ★

LONG ISLAND OFFICE

       On July 8, 2013, appellant The Brown Publishing Company Liquidating Trust

("appellant" or "the Trust"), the successor in interest to The Brown Publishing Company

("BPC"), filed in the United States Bankruptcy Court for the Eastern District of New York ("the

bankruptcy court") a notice of appeal to this Court from a memorandum decision and order of the

bankruptcy court (Eisenberg, U.S.B.J.), dated June 24, 2013, granting the motion of appellee

AXA Equitable Life Insurance Company ("AXA Equitable") pursuant to Rule 56(c) of the

Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings by Rule 7056 of

the Federal Rules of Bankruptcy Procedure ("the Bankruptcy Rules"), for summary judgment

dismissing the Trust's complaint against it. The notice of appeal and record on appeal were

transmitted to this Court on August 19, 2013. For the reasons set forth below, the memorandum

decision and order of the bankruptcy court is affirmed in part and remanded in part.

1

I.    Background

    A.    Factual Background

The following facts are undisputed[1]:

On or about March 18, 2005, AXA Equitable issued a Flexible Premium Joint Survivorship Universal Life Insurance Policy, insuring the lives of Clarence J. Brown and Joyce E. Brown ("the Insureds") under policy number 154 225 052 ("the Policy"), to B's Nest Ohio General Partnership ("B's Nest"), as the owner and beneficiary of the Policy. (AXA Equitable's "Local Rule 7056-1 Statement of Undisputed Facts in Support of Motion for Summary Judgment" ["AXA's 7056-1 Stat."], ¶¶ 1-3; Appellant's "Statement pursuant to Rule 7056" ["Appellant's 7056 Stat."], ¶¶ 1, 4-6, 8). At all relevant times, the Insureds' sons, Roy Brown and Clarence "Clancy" Brown (collectively, "the Brown brothers"), were the general partners of B's Nest. (Appellant's 7056 Stat., ¶ 1; Declaration of Leslie Carpenter in Support of AXA Equitable's Motion for Summary Judgment ["Carpenter Decl."], ¶ 6).

The Policy contains the following relevant provisions:

    1.    "[P]remiums may be paid at any time and in any amount after an initial premium payment[] [of twenty-four thousand three hundred seven dollars and eighty-five cents ($24,347.85)] and subject to certain minimums and maximums[,]" (Carpenter Decl., ¶ 9(a); see Appellant's 7056 Stat., ¶ 10);

---

[1] In its opposition to AXA Equitable's motion for summary judgment, appellant did not identify any material facts as to which it contended that there exists a genuine issue to be tried. Accordingly, pursuant to Rule 7056-1 of the Local Bankruptcy Rules of the Eastern District of New York, appellant is deemed to have admitted all of the facts set forth in AXA Equitable's 7056-1 Statement. Likewise, AXA Equitable did not dispute any of the facts set forth in appellant's 7056 Statement. ("Reply to Plaintiff's Objection to Defendant's Motion for Summary Judgment" ["Reply Mem."], at 3).

2.  "[C]ertain specified deductions [are taken] from the Policy Account by AXA Equitable[,]" (AXA's 7056-1 Stat., ¶ 7), including monthly deductions in "an amount to cover an administrative charge, the cost of insurance and the cost of any benefits provided by riders to the Policy," (Carpenter Decl., ¶ 9(e); see Appellant's 7056 Stat., ¶ 13)[2];

3.  "AXA Equitable deducts from premiums received a premium charge and any overdue monthly deductions[,]" (Carpenter Decl., ¶ 9(e)), then "net premiums are deposited into B's Nest's policy account (the 'Policy Account'), which earns interest[,]" (id.; AXA's 7056-1 Stat., ¶ 4);

4.  Other than those "limited deductions specified in the Policy, AXA Equitable may not deduct for itself or any other party any amount from the Policy Account except upon the direction of B's Nest as the owner of the Policy[,]" (AXA's 7056-1 Stat., ¶ 7);

5.  "B's Nest may take a loan on the Policy while it has a loan value[,]" (id., ¶ 5; see Appellant's 7056 Stat., ¶ 14)[3], and "[a]ny amount on loan is part of [B's Nest's] Policy Account[,]" (Carpenter Decl., ¶ 9(d));

6.  B's Nest may also "give up the Policy for its cash surrender value at any time while either or both Insureds are living[] [and] [t]he cash surrender value on any date is equal to the amount in the Policy Account on that date minus any applicable surrender charge[,]" (id., ¶ 9(c); see Appellant's

---

[2] In addition, the Policy provides that AXA Equitable deducts, *inter alia*, a "premium charge" in "an amount not to exceed 10% from each premium payment * * * [and] reserve[s] the right to increase th[at] percentage limit as a result of changes in the tax laws which increase [its] expenses." (Policy at 3).

[3] AXA Equitable "charges interest on loans taken on the policy account * * * [and] [a] policy loan will have a permanent effect on the benefits under the [P]olicy even if the loan is repaid." (Appellant's 7056 Stat., ¶ 14).

7056 Stat., ¶ 15)[4]; and

7. "The death benefit is the greater of (a) the base
policy face amount, or (b) a percentage of the
amount in the Policy Account on the date of death
of the second of the Insureds to die[,]" (id., ¶ 9(f)).

According to AXA Equitable, "B's Nest had exclusive dominion and control over the

Policy Account and in fact exercised such dominion and control by taking loans against the

Policy Account's cash value[,]" (AXA's 7056-1 Stat., ¶ 14), whereas it "was not free to use the

monies [in the Policy Account] as it wished[.]" (Id. ¶ 15).

Pursuant to the terms of a Split Dollar Life Insurance Agreement between BPC and B's

---

[4] In addition, the Policy provides that "[a]fter the first policy year, and while either or
both [the Insureds] are living, [B's Nest] may ask for a partial Net Cash Surrender Value
withdrawal by written request to [AXA Equitable's] Administrative Office. [The] request will be
subject to [AXA Equitable's] approval based on [its] rules in effect when [it] receive[s] [the]
request, and to the minimum withdrawal amount of $500.00. [AXA Equitable] ha[s] the right to
decline a request for a partial Net Cash Surrender Value withdrawal if [it] would cause the
[P]olicy to fail to qualify as life insurance under applicable tax law, as interpreted by [it] * * *
[and] will decline a request for a partial Net Cash Surrender Value withdrawal if [it] would cause
a decrease in the base policy face amount to less than $200,000. A partial withdrawal will result
in a reduction in the Cash Surrender Value and in [B's Nest's] Policy Account equal to the
amount withdrawn as well as a reduction in [B's Nest's] death benefit." (Policy at 10).

The Policy also provides that AXA Equitable "may defer payment of any Net Cash
Surrender Value withdrawal or loan amount (except when used to pay premiums to [it]) for up to
six months after [it] receive[s] a request for it * * * [and] will allow interest, at a rate of at least
3% a year, on any Net Cash Surrender Value payment that [it] defer[s] for 30 days or more."
(Policy at 13).

In addition, the Policy provides that AXA Equitable reserved "the right to decline to
accept premium payments, to decline to change death benefit options, to decline to change the
face amount [of the Policy], or to decline to make partial withdrawals that, in [its] opinion, would
cause th[e] [P]olicy to fail to qualify as life insurance under applicable tax law[,] * * * [and] to
make changes in th[e] [P]olicy or its riders * * * or to require additional premium payments, or to
make distributions from th[e] [P]olicy or to change the face amount to the extent [it] deem[s] it
necessary to continue to qualify th[e] [P]olicy as life insurance." (Policy at 12).

4

Nest, BPC made four (4) premium payments to AXA Equitable on account of the Policy on December 22, 2006, December 20, 2007, January 26, 2009 and October 1, 2009, in the aggregate amount of three hundred thousand dollars ($300,000.00) ("the Transfers"). (Appellant's 7056 Stat., ¶ 2). According to AXA Equitable, "[i]n accordance with the terms of the Policy, [it] deposited the net premiums into [the] interest-bearing [P]olicy [A]ccount * * * owned by * * * B's Nest[] * * *." (AXA's 7056-1 Stat., ¶ 12). The Policy Account "earns interest at rates declared by [AXA Equitable] periodically[,] * * * not * * * less than 3% on an annual basis." (Appellant's 7056 Stat., ¶ 9).

On April 30, 2010, BPC filed in the bankruptcy court a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("the Bankruptcy Code"). (Compl., ¶ 8 & n. 1).

Between August 20, 2010 and February 28, 2012, B's Nest took four (4) loans on the Policy, (AXA's 7056-1 Stat., ¶ 5), in the total amount of one million seventy-five thousand dollars ($1,075,000.00), (Carpenter Decl., ¶ 12), of which they repaid four hundred forty-five thousand one hundred seventy-four dollars and ninety-six cents ($445,174.96) on December 17, 2010. (Id., ¶ 13).

On June 16, 2011, the bankruptcy court confirmed BPC's Plan of Reorganization, (Compl., ¶ 9), which became effective on June 22, 2011. (Compl., ¶ 10). Pursuant to paragraph nine (9) of the Confirmation Order, and certain articles of the Plan, "all property of [BPC's] estate * * * that [BPC] * * * and/or [its Estate] may hold against any Person * * * vested in the [Trust] and the Liquidating Trustee was given the sole and absolute discretion 'to pursue or not to pursue, settle, compromise or abandon any and all claims and Causes of Action as he determines is in the best interests of the beneficiaries of the [Trust] and consistent with the

5

purposes of [the] [Trust].'" (Compl., ¶ 12).

B.    Procedural History

On April 30, 2012, the Trust commenced an adversary proceeding against AXA Equitable in the bankruptcy court pursuant to, *inter alia*, 11 U.S.C. §§ 544(b) and 548, and Ohio Rev. Code 1336.04, seeking to avoid the Transfers on the basis, *inter alia*, that they were fraudulent conveyances by BPC on behalf of B's Nest.  The third cause of action in the complaint alleges, *inter alia*, that appellant "is entitled to avoid each Transfer * * * pursuant to sections 544(b) and 548 of the Bankruptcy Code and [AXA Equitable] is the initial, immediate or mediate transferee with respect to such Avoided Transfers within the meaning of section 500 of the Bankruptcy Code."  (Compl., ¶ 24).

In its answer, dated July 13, 2012, AXA Equitable generally denies the allegations in the complaint and raises thirteen (13) defenses, including, *inter alia*, that appellant "may not recover the alleged [T]ransfers described in the Complaint pursuant to 11 U.S.C. Section 550(b)."  (Ans., ¶ 37).

On or about February 4, 2013, AXA Equitable moved in the bankruptcy court pursuant to Rule 56 of the Federal Rules of Civil Procedure, as made applicable to the bankruptcy court by Rule 7056 of the Bankruptcy Rules, for summary judgment dismissing the complaint in the adversary proceeding against it on the basis that it "was the 'mere conduit' of the Equitable Transfers and therefore as a matter of law cannot be held liable for the Equitable Transfers under Bankruptcy Code section 550."  (AXA Equitable's "Memorandum of Law in Support of Motion for Summary Judgment" ["SJ Mem."] at 3).  In opposition, the Trust contended that AXA

Equitable is an initial transferee within the meaning of section 500 of the Bankruptcy Code

because it has dominion and control over the premiums paid to it by BPC and the money in the

Policy Account, insofar as, *inter alia*, it "had the authority to decline premium payments, to

decline partial withdrawals to B's Nest, to reject withdrawal of the Policy Account and to defer

payment of net cash surrender value for up to six months after requested by B's Nest[] * * *

[and] [is] obligate[d] [] to pay a death benefit of $3,833,705.00 upon the deaths of its insureds."

("Plaintiff's Objection to Defendant's Motion for Summary Judgment" ["Opp. Mem."] at 12).[5]


      C.     Bankruptcy Court's Memorandum Decision and Order

By memorandum decision and order ("Order") dated June 24, 2013, the bankruptcy court

(Eisenberg, U.S.B.J.), found, in relevant part: (1) that summary judgment was appropriate

because there were "no issues of material fact as the facts [were] not in dispute" and the issues

raised were based on the Trust's interpretation of the Policy, (Order at 1); and (2) that AXA

Equitable "is not an initial transferee, nor the immediate or mediate transferee under 11 U.S.C. §

550," (id. at 1, 15), and "was a mere conduit and did not have dominion and control over the

Transfers[,]" (id. at 15). Specifically, the bankruptcy court found, in relevant part:

> "It is clear that the Policy is not a straightforward type of life
> insurance policy which would simply provide the beneficiaries
> with payment of the face amount of the Policy upon the death of
> the Insureds. Rather, the Policy was a special contract between

---

[5] Although the Trust indicated in the background section of its opposition that "[t]here
has been no formal discovery yet in th[e] Adversary Proceeding[,]" (Opp. Mem. at 3), it did not
argue that it needed discovery in order to oppose the motion for summary judgment until the
hearing on the motion held before the bankruptcy court on or about May 22, 2013.

B'Nest[6] and AXA [Equitable] that provided not only an insurance
benefit but also functioned as an investment vehicle by earning
interest with respect to the net amount in the Policy Account.
Unlike traditional term insurance policies, as long as there were
sufficient funds in the Policy Account while either Insured is alive,
B'Nest need not make any premium payments to maintain the
Policy in effect, or B'Nest could vary its 'premium' payments.

Although AXA [Equitable] was the recipient of the Transfers from
[BPC], [its] ability to exert control over the funds deposited in the
Policy Account was limited by the terms of the Policy contract.
None of the restrictions specified by [appellant] enabled AXA
[Equitable] to control and take the funds in the Policy Account for
[its] own discretionary use or protection. AXA [Equitable] was
required to deposit the Transfers less premium charges in B's Nest
[sic] Policy Account and the net funds in the Policy Account were
subject to B'Nest's control. Unlike Bear Stearns, AXA [Equitable]
did not have the ability or right to take any part of the funds in the
Policy Account for its own use and benefit to protect itself. Other
than the limited deductions for premium charges, and
administrative and surrender charges that were agreed upon
between B'Nest and AXA [Equitable], AXA [Equitable] had no
control over the funds in the Policy Account. The interest earned
with respect to the net amount in the Policy Account was for the
benefit of B'Nest and the beneficiaries of the Policy by increasing
the cash surrender value of the policy and potentially the death
benefit payable.

B'Nest had the right and ability to take out loans against the Policy
for its own use based upon the value of the Policy Account, which
it did on four occasions, or it could terminate the Policy for the
Policy's case surrender value. Unlike Bear Stearns, AXA
[Equitable] had no authority to use the funds for its own purposes
or to offset the loans taken out by B'Nest against the amount in the
Policy Account to pay itself back. Rather, AXA [Equitable] could
only end the Policy if there were insufficient funds in the Policy
Account to cover the administrative charges as they became due.

---

6 Although the bankruptcy court indicated that it would refer to B's Nest Ohio General
Partnership as "B's Nest" in the Order, (Order at 2), other than three (3) or four (4) references to
"B's Nest, (Order at 2, 11-12), it almost invariably referred to that entity as "B'Nest" in the
Order. This Court recognizes that error and will not designate it with a "[sic]" throughout this
order.

8

Accordingly, AXA [Equitable] acted as a mere conduit with respect to the net amounts deposited into B's Nest [sic] Policy Account because it had no dominion and control over the use of the funds in the Policy Account other than agreed upon deductions for the administrative charges. While AXA [Equitable] had the right to delay the payment of any net cash surrender value or the advance of a loan for a period of up to 6 months, AXA [Equitable] does not have the right to refuse to make the payment or advance. Based upon the terms in this Policy and the facts and circumstances surrounding the Policy, AXA [Equitable] is not an initial transferee with respect to the Transfers with respect to the net funds deposited into the Policy Account.

With respect to the premium charges deducted from the Transfers prior to the net funds being deposited into the Policy Account and the monthly administrative charges deducted from the Policy Account to maintain the Policy, AXA [Equitable] did gain control of those funds and those charges were for the benefit of AXA [Equitable]. However, whether AXA [Equitable] is deemed to be an initial transferee with respect to the premium and administrative charges depends upon the nature of the underlying obligation to pay th[o]se charges. There is no evidence to indicate that they were not paid pursuant to the terms of the contract.

* * *

Here, AXA[] [Equitable's] ability to deduct and retain the premium and administrative charges from the Transfers and from the Policy Account is based upon a contractual relationship with B'Nest, the owner of the Policy, not [BPC]. The deduction for the premium charges from the Transfers prior to depositing the net funds in the Policy Account is simply an offset of B'Nest [sic] obligation to pay the premium charges to AXA [Equitable] taken in one step rather than a two-step process of AXA [Equitable] deducting the premium charges from the funds once deposited into the Policy [sic] and such offset has been held to be of no significance. If the obligation to make the premium payment arose from a contractual obligation between [BPC] and AXA [Equitable], then the outcome would potentially be different as AXA [Equitable] would then not be an intermediary but a direct beneficiary of the premium payments. That is not what the facts reveal here.

9

With respect to the administrative charges deducted from the
Policy Account, it is clear that the funds from which the
administrative charges were being deducted were in the dominion
and control of B'Nest. B'Nest was free to do what it wanted with
the funds in the Policy Account until the time AXA [Equitable]
made its periodic deductions from the Policy Account for the
administrative charges or any other charges under the Policy.
Furthermore, like the premium charges, payment of the
administrative charges is an obligation of B'Nest and not [BPC].
Thus, the payment of the administrative charges from B'Nest [sic]
Policy Account satisfies B'Nest [sic] obligation to make th[o]se
payments in order to keep the Policy in effect. Accordingly, AXA
[Equitable] is not an initial transferee of [BPC's] funds with
respect to the premium and administrative charges deducted by
AXA [Equitable], and th[o]se charges are not subject to avoidance
under section 550(a)(1).

In addition, pursuant to 11 U.S.C. § 550(b), a trustee may not
recover from an immediate or mediate transferee under 11 U.S.C. §
550(a)(2) that 'takes for value, including satisfaction or securing of
a present or antecedent debt, in good faith, and without knowledge
of the voidability of the transfer avoided.'" 11 U.S.C. § 550(b)(1).
* * *

In this case, AXA [Equitable] provided value for the premium and
administrative charges in the nature of maintaining the Policy in
effect, and continuing its obligation to pay interest on the net
amount in the Policy Account as calculated under the Policy terms
and to pay out the death benefit on the Policy while the Policy
remained in effect. In addition, there is no allegation in the
Complaint or any evidence that AXA [Equitable] had any
knowledge of the voidability of the Transfers. AXA [Equitable]
would not have knowledge of [BPC's] financial condition because
AXA[] [Equitable's] contractual relationship was with B'Nest.
AXA [Equitable] would have no reason to know or investigate
[BPC's] financial condition prior to accepting the funds transferred
with respect to the Policy. Accordingly, 11 U.S.C. § 550(b)
applies and recovery cannot be had against AXA [Equitable] as an
immediate or mediate transferee under 11 U.S.C. § 550(a)(2)."

(Order at 10-15) (underline added).

Accordingly, the bankruptcy court granted AXA Equitable's motion for summary

judgment and dismissed the Trust's complaint against it in the adversary proceeding.

      D.    The Appeal

On or about July 8, 2013, the Trust filed in the bankruptcy court a notice of appeal from the bankruptcy court's June 24, 2013 memorandum decision and order, which was transmitted to this Court, together with the record on appeal, on August 19, 2013. The Trust contends, *inter alia*, that the bankruptcy court erred in finding that AXA Equitable "was a mere conduit of the BPC Payments and not a transferee for purposes of 11 U.S.C. § 550(a)[,]" (Appellant's Brief ["App. Brief"] at 20), because (1) AXA Equitable "was selling a product[,]" i.e., life insurance, (id. at 18), and, "[w]hile B's Nest had certain rights under the Policy, th[o]se rights were curtailed by [AXA Equitable's] superior rights * * * and were constrained to protect and preserve [AXA Equitable's] financial interests and limit its downsize risks[,]" (id.); (2) AXA Equitable "had dominion and control over the monies in the Policy Account as the Policy afforded it with the absolute right to deduct amounts from premium payments and the balance of the Policy Account[,]" (id.)[7], i.e., AXA Equitable "could unilaterally take affirmative measures with respect

_____

    [7] Specifically, appellant contends, *inter alia*, that the following provisions in the Policy demonstrate that AXA Equitable had dominion and control over the premium payments made by BPC: (1) "[w]hile B's Nest could take a loan from the Policy Account, the loan was limited to the Cash Surrender Value, an amount equal to the Policy Account less the surrender charge of $117,771.42[,]" and AXA Equitable "maintained a lien on the Policy Account for any loan and had the right to defer payment of any request to withdraw the Net Cash Surrender Value for up to six months[,]" (App. Brief at 18); and (2) "[w]hile [AXA Equitable] placed the 'net premiums' into the Policy Account, the Policy Account remained available to satisfy the subsequent Monthly Deductions that would be debited from the Policy Acount[] [and] [w]here the Net Policy Account Value was insufficient to cover the Monthly Deductions[,] the Policy was deemed in default and subject to termination if [AXA Equitable] failed to receive within the 'Grace Period' funds to cover all Monthly Deductions for three months," (id.).

to the account to protect itself * * * from suffering losses and undertaking excessive risk in providing the Policy's benefits [,]" (id. at 18-19); (3) AXA Equitable earned a profit and "[g]iven the 'monthly cost of insurance' alone, which was potentially large enough to equal the entirety of the BPC Payments, one can only conclude that the Monthly Deductions taken by [it] were significant[,]" (id. at 19); (4) "[w]hile, theoretically, the net premiums are deposited in the Policy Account, [AXA Equitable] provided no evidence that the Payments were placed in a segregated account rather than commingled[,]" (id.); (5) AXA Equitable "held the express authority to act without further direction and to use the BPC Payments and the Policy Account to pay the amounts [it] was due for the premium charge and Monthly Deductions[,]" (id. at 20); (6) "B's Nest did not have dominion and control over the BPC Payments[,] (id.), insofar as its "rights were limited * * * [and] subject to [AXA Equitable's] rights to ensure there was sufficient value in the Policy Account to cover Monthly Deductions, loan requests and loan interest[,]" (id.), and "[it] could not put the value of the Policy Account to its own use * * * [or] simply instruct [AXA Equitable] to return the value of the Policy Account as it could with a bank account[,]" (id.); and (7) AXA Equitable "charged interest on loans taken by B's Nest against the Policy's value[,] * * * [which] clearly compensates [it] for B's Nest's use of funds that [it] would otherwise use to invest for [its] own benefit[,]" (id.). In addition, appellant contends that the bankruptcy court erred: (1) by granting summary judgment on AXA Equitable's affirmative defense under 11 U.S.C. § 550(b) because (a) AXA Equitable did not move for summary judgment on that ground, (b) "there was simply nothing in the record upon which the Bankruptcy Court could make the factual findings necessary to rule on the Section 550(b) defense: that [AXA Equitable] took the Payments for value, in good faith and without knowledge of the voidability of the transfers[,]"

(id. at 21), and (c) it "improperly placed upon [appellant] the burden of coming forward with evidence that [AXA Equitable] did not provide value, did not act in good faith and had knowledge of the voidability of the transfer of the Payments[,]" (id. at 22); and (2) by "denying its request, made at the outset of the hearing on the motion, pursuant to Red. R. Civ. P. 56(d) to delay consideration of the Motion for the purpose of conducting formal discovery of material facts directly relating to issues raised by the Motion[,]" (id.).

II.    Discussion

    A.    Standard of Review

On an appeal from a bankruptcy court order, a district court must review findings of fact for "clear error." Berger & Assocs. Attorneys, P.C. v. Kran (In re Kran), 760 F.3d 206, 207 (2d Cir. 2014); see also Fed. R. Bankr. P. 8013. Conclusions of law, on the other hand, are reviewed de novo. In re Kran, 760 F.3d at 207; see also MBB Realty Ltd. P'ship v. Great Atl. & Pac. Tea Co., Inc. (In re Great Atl. & Pac. Tea Co., Inc.), 509 B.R. 430, 441-42 (S.D.N.Y. 2014). The bankruptcy court's denial of the Trust's request to delay consideration of the motion for summary judgment in order to conduct formal discovery and decision to grant summary judgment sua sponte on AXA Equitable's affirmative defense under 11 U.S.C. § 550(b) are reviewed for abuse of discretion. See Pippins v. KPMG, LLP, 759 F.3d 235, 251 (2d Cir. 2014); Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994); Smith v. Perkins Bd. of Educ., 708 F.3d 821, 828 (6th Cir. 2013).

Rule 8013 of the Federal Rules of Bankruptcy Procedure, effective until December 1, 2014, provides, in relevant part, that "[o]n an appeal, the district court * * * may affirm, modify,

13

or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." A district court "need not agree with every conclusion reached by the Bankruptcy Court and may affirm the decision on any ground supported in the record." In re Caldor, Inc.–NY, 199 B.R. 1, 2 (S.D.N.Y. 1996), aff'd sub nom Virginia Elec. & Power Co. v. Caldor, Inc.–NY, 117 F.3d 646 (2d Cir. 1997) (quotations, alterations and citation omitted); see also Freeman v. Journal Register Co., 452 B.R. 367, 369 (S.D.N.Y. 2010) (holding that a district court may affirm a bankruptcy court's decision "on any ground that finds support in the record[.]")

###### B. Summary Judgment Standard

"Under Federal Rules of Civil Procedure 56, applicable in adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, a court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" In re Kran, 760 F.3d at 207 (quoting Fed. R. Civ. P. 56(a)). Accordingly, a grant of summary judgment is reviewed *de novo*. Christy v. Alexander & Alexander of New York, Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey) ("Finley, Kumble"), 130 F.3d 52, 55 (2d Cir. 1997).

In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); see Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the

nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added) (internal quotations and citation omitted)). "A fact is material if it might affect the outcome of the suit under governing law." Royal Crown Day Care LLC v. Dep't of Health and Mental Hygiene of City of New York, 746 F.3d 538, 544 (2d Cir. 2014) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

If the district court determines that there is a genuine dispute as to a material fact, the court must then "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," Euchner-USA, Inc. v. Hartford Cas. Ins. Co., 754 F.3d 136, 140 (2d Cir. 2014) (quotations and citation omitted); see also Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) ("In considering whether summary judgment is appropriate, a court is required to view the evidence in the light most favorable to the party against whom the motion was made and to draw all reasonable inferences in favor of that party"), to determine whether there is a genuine issue for trial. See Ricci, 557 U.S. 557, 129 S.Ct. at 2677. "An issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Dalberth v. Xerox Corp., — F.3d —, 2014 WL 4390695 (2d Cir. Sept. 8, 2014) (quoting Anderson, 477 U.S. at 248, 106 S. Ct. 2505). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci, 557 U.S. 557, 129 S.Ct. at 2677 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); see also Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012) ("There is no genuine issue of material fact where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." (quotations and citation omitted)).

"The moving party bears the burden of establishing the absence of any genuine issue of

15

material fact," Zalaski v. City of Bridgeport Police Department, 613 F.3d 336, 340 (2d Cir. 2010); see also Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010) (accord), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011); see also F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003) (alterations in original); see also Fabrikant, 691 F.3d at 205. The nonmoving party cannot avoid summary judgment simply by asserting "some metaphysical doubt as to the material facts[,]" Brown, 654 F.3d at 358 (quoting Matsushita Elec., 475 U.S. at 586, 106 S. Ct. 1348); "may not rely on conclusory allegations or unsubstantiated speculation," id. (quotations and citations omitted); and must offer "some hard evidence showing that its version of the events is not wholly fanciful." Miner v. Clinton Cnty, N.Y., 541 F.3d 464, 471 (2d Cir. 2008).


      C.     Claimed Procedural Errors

            1.     Denial of Appellant's Request to Delay Consideration of the Motion to Conduct Discovery

Rule 56(d) of the Federal Rules of Civil Procedure provides:

> "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

Fed. R. Civ. P. 56(d).

"[T]he failure to file an affidavit [or declaration] under Rule 56(f) [now Rule 56(d)] is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Paddington Partners, 34 F.3d at 1137; see also In re World Trade Center Lower Manhattan Disaster Site Litigation, 758 F.3d 202, 212 n. 3 (2d Cir. 2014); Di Benedetto v. Pan Am World Serv., Inc., 359 F.3d 627, 630 (2d Cir. 2004). Nothing in the record suggests that appellant ever filed an affidavit or declaration in accordance with Rule 56(d) of the Federal Rules of Civil Procedure and its reference to the lack of discovery in the adversary proceeding in its memorandum in opposition to the motion for summary judgment and belated oral request to delay consideration of the motion for summary judgment to allow it to conduct formal discovery at the hearing on the motion were not "adequate substitute[s] for a[n] * * * affidavit [under Rule 56(d)]." Paddington Partners, 34 F.3d at 1137.

Moreover, appellant did not even dispute any of the facts set forth in AXA Equitable's 7056-1 Statement, nor did AXA Equitable dispute any of the facts set forth in appellant's 7056 Statement. There being no dispute as to any of the material facts, the bankruptcy court only needed to determine if the undisputed facts identified by the parties entitled AXA Equitable to judgment as a matter of law. Accordingly, the bankruptcy court did not abuse its discretion in denying appellant's belated oral request to delay consideration of the motion for summary judgment in order to allow it to conduct formal discovery.

2.      *Sua Sponte* Grant of Summary Judgment

"Under Federal Rule of Civil Procedure 56(f), district courts have discretion to grant summary judgment *sua sponte* '[a]fter giving notice and a reasonable time to respond' and 'after identifying for the parties material facts that may not be genuinely in dispute.'" Swatch Grp. Mgmt.

Servs. Ltd. v. Bloomberg L.P., 756 F.3d 73, 80 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(f)). "Before granting summary judgment *sua sponte*, however, a district court must assure itself that following the procedures set out in Rule 56(a)-(e) would not alter the outcome[,] * * * [i.e.,] discovery must either have been completed, or it must be clear that further discovery would be of no benefit, such that the record reflects the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment." Id. (quotations, alterations and citation omitted)).

AXA Equitable did not move for summary judgment dismissing the Trust's claim seeking recovery against it as an "immediate or mediate transferee of [an] initial transferee" under 11 U.S.C. § 550(a)(2)[8], or on the basis of its affirmative defense under 11 U.S.C. § 550(b), and it does not appear from the record that appellant was ever provided notice that the bankruptcy court was considering granting summary judgment on AXA Equitable's affirmative defense under 11 U.S.C. § 550(b), or an opportunity to respond thereto. Accordingly, so much of the bankruptcy court's

_____

[8] Clearly, AXA Equitable is not an immediate or mediate transferee of the funds from the Transfers that it received directly from BPC and deposited into B's Nest's Policy Account. See, e.g. Jobin v. McKay (In re M&L Bus. Mach. Co., Inc.), 84 F.3d 1330, 1337 (10th Cir. 1996) (finding that the defendant was not an immediate or mediate transferee under Section 550(a)(2) because he received the disputed funds directly from the debtor); In re Palisades at West Paces Imaging Ctr., LLC, 501 B.R. 896, 916-17 (Bankr. N.D. Ga. 2013) ("An immediate or mediate transferee is one who takes in a later transfer down the chain of title or possession. * * * The immediate transferee is the one who receives a transfer from the initial transferee and all other recipients are mediate transferees."); Slone v. Anderson (In re Anderson), 511 B.R. 481, 502 (Bankr. S.D. Ohio 2013), aff'd, 510 B.R. 113 (6th Cir. BAP 2014) (accord); Grochocinski v. Knippen (In re Knippen), 355 B.R. 710, 728 (2006), aff'd, No. Civ.A. 07 C 1697, 2007 WL 1498906 (N.D. Ill. 2007) (accord). However, it may be an immediate transferee of the funds that it deducted from the Transfers for premium and administrative charges under the Policy. It is for the bankruptcy court in the first instance to determine, after providing the parties with an opportunity to respond, whether AXA Equitable is an immediate or mediate transferee with respect to such funds and, if so, whether it has established its entitlement to judgment as a matter of law on its affirmative defense under 11 U.S.C. § 550(b).

memorandum decision and order as *sua sponte* granted summary judgment on AXA Equitable's affirmative defense under 11 U.S.C. § 550(b) and dismissed the Trust's claim seeking recovery against AXA Equitable as an immediate or mediate transferee under Section 550(a)(2) is vacated and remanded to the bankruptcy court with instructions to provide the parties with an opportunity to respond to the issue of whether AXA Equitable is entitled to judgment as a matter of law on its affirmative defense under 11 U.S.C. 550(b) pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

D.     Merits

Section 550(a) of the Bankruptcy Code provides, in relevant part:

> "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544 * * * [or] 538 * * * of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from– (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or meditate transferee of such initial transferee."

11 U.S.C. § 550(a). "The Bankruptcy Code, however, does not define 'initial transferee[,]'" Finley, Kumble, 130 F.3d at 56, "and there is no helpful legislative history." Bear Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.), 397 B.R. 1, 14 (S.D.N.Y. 2007); see also CNB Int'l, Inc. v. Lloyds TSB Bank PLC (In re CNB Int'l, Inc.), 440 B.R. 31, 38 (W.D.N.Y. 2010).

In the seminal case of Bonded Financial Servs v. European Am. Bank, 838 F.2d 890 (7th Cir. 1988), the Seventh Circuit adopted a "dominion and control test" for determining who is an initial transferee under Section 550(a)(1), pursuant to which "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own

19

purposes." Id. at 893. In Finley, Kumble, the Second Circuit noted that "[t]he Seventh Circuit's logic [in Bonded] has been widely adopted," 130 F.3d at 58 (citing cases), and "join[ed] th[o]se other circuits in adopting the 'mere conduit' test for determining who is an initial transferee under § 550(a)(1)." 130 F.3d at 58. Pursuant to that test, "a commercial entity that, in the ordinary course of its business, acts as a mere conduit for funds and performs that role consistent with its contractual undertaking in respect of the challenged transaction, is not an initial transferee within the meaning of § 550(a)(1)." Id. at 59.[9] To ascertain whether an entity is more than a mere conduit of the challenged transfers, courts must "examine the transfers themselves * * *." Id.

In Bear Stearns, the district court held that "[b]ecause [Finley, Kumble] analyzed Bonded and approved of its reasoning, the 'dominion and control' test as stated in Bonded is also an essential part of the 'initial transferee' inquiry in this Circuit." 397 B.R. at 15; see also CNB Int'l, 440 B.R. at 38 ("Finley, Kumble did not provide a general definition for a mere conduit, but did explicitly adopt the logic of the Seventh Circuit as articulated in Bonded and its progeny. Bonded is the seminal case on the issue of initial transferees, and the Fourth, Fifth, Sixth, Ninth, Tenth and Eleventh Circuits have also adopted some version of the Bonded standard, referred to as the 'dominion' and/or 'control' test.") Thus, "just because a party is not a 'mere conduit' in the prototypical sense of the term–i.e., a party that receives the money merely to pass it on to a third-party–does not mean that the party has requisite 'dominion and control' over the funds." Bear Stearns, 397 B.R. at 15. Accordingly, the district court in Bear Stearns held that Finley, Kumble

---

[9] In Bear Stearns, the court found that the "mere conduit test" frames the Seventh Circuit's "dominion and control test" in the negative, i.e., "[r]ather than stating that a party is an initial transferee if it exercises 'dominion and control' over the funds, the Second Circuit's version of the test states that a party is *not* an initial transferee if it was a 'mere conduit' of the funds." 397 B.R. at 14-15 (emphasis in original).

"established the combined rule that an initial transferee must exercise dominion over the funds at issue and be able to put them to 'his own purposes' even if it is not a 'mere conduit' in the standard sense of the term." Id.[10]; see also CNB Int'l, 440 B.R. at 39 (holding that all of the circuit-level decisions "are consistent in applying the concept of legal dominion or control over the funds at issue as dispositive.") Accordingly, AXA Equitable "is an initial transferee only if it exercised legal dominion and control over the [Transfers] from [BPC]," CNB Int'l, 440 B.R. at 40; otherwise, it is "a mere conduit." Id.

Other than the initial premium payment, and subject only to certain agreed-upon minimum and maximum amounts set forth in the Policy, B's Nest controls when and for what amount to make premium payments under the Policy. AXA Equitable has no discretion or authority to do anything with the premium payments made on account of the Policy, including the Transfers from BPC, or with the funds in B's Nest's Policy Account other than in accordance with its contractual undertakings under the Policy. See, e.g. Danning v. Miller (In re Bullion Reserve of North America), 922 F.2d 544, 549 (9th Cir. 1991) (holding that the defendant was not an initial transferee, even though the funds were eventually used to purchase stock in his name, because he was under a contractual duty to dispose of the funds in a particular way and, thus, he had no dominion or control over the funds); Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1200 (11th Cir. 1988) (holding that a bank that received money for deposit into its customer's account was not an initial transferee, even if that money was eventually used to reduce the customer's indebtedness to the bank, because the bank never had actual control of the funds).

---

[10] In Goldman Sachs Execution & Clearing, L.P. v. Official Unsecured Creditors' Comm. of Bayou Grp., LLC, 491 F. App'x 201 (2d Cir. July 3, 2012) (summary order), the Second Circuit indicated that "[w]hile we have not previously endorsed the district court's decision in [Bear Stearns] * * *neither have we rejected it." Id. at 205.

In other words, AXA Equitable is bound by the terms of the Policy in how it handles the premium payments it receives on account of the Policy and the funds in the Policy Account, and it cannot otherwise use those payments, including the Transfers, or funds for its own purposes or protection.

Although the Policy affords AXA Equitable discretion to defer payment of any net cash surrender value withdrawal or loan request made by B's Nest, it also provides that AXA Equitable must pay interest upon any net cash surrender value payment that it defers for thirty (30) days or more and it does not afford AXA Equitable the right to deny any such withdrawal or loan request from B's Nest, with two (2) limited exceptions: (1) if AXA Equitable determines that the partial withdrawal will cause the Policy to fail to qualify as life insurance under applicable tax law or (2) if the partial withdrawal will decrease the face amount of the Policy to less than two hundred thousand dollars ($200,000.00), it may decline a request by B's Nest for a partial net cash surrender value withdrawal. Those limited instances of AXA Equitable's discretionary authority to deny a request by B's Nest for a partial net cash surrender value withdrawal, to which B's Nest contractually agreed, are insufficient to establish that AXA Equitable has dominion or control of the premium payments it receives on account of the Policy, including the Transfers, or the funds in the Policy Account.

Moreover, AXA Equitable is not an initial transferee of the funds it receives from deducting the premium and administrative charges from the premium payments, including the Transfers, and the Policy Account in accordance with the Policy. Once the premium payments were made by BPC, title to the funds vested in B's Nest and B's Nest was free to do with the funds as it saw fit, subject only to its contractual obligations under the Policy, e.g., to pay certain premium and administrative charges to AXA Equitable. Rather than having the entirety of the premium payments deposited into the Policy Account and then deducting the charges for which B's

22

Nest is contractually obligated from the Policy Account, the Policy simplifies the process by allowing AXA Equitable to, in effect, offset the premium payments it receives by the amount of the charges for which B's Nest is contractually obligated and deposit the remainder into B's Nest's Policy Account. In essence, the transfer of funds to AXA Equitable as payment for the premium and administrative charges contemplated under the Policy was not a transfer by BPC, which did not owe the fees to AXA Equitable, but a transfer by B's Nest in satisfaction of its contractual obligations under the Policy. See Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Invs., Inc.), 155 B.R. 332, 340-41 (S.D.N.Y. 1993); see also Grayson Consulting, Inc. v. Wachovia Securities, LLC (In re Derivium Capital LLC), 716 F.3d 355, 362 (4th Cir. 2013) (affirming the grant of summary judgment for the defendant on the basis that "notwithstanding funds taken and retained as commission and fees, [the defendant] was not [an] initial transferee * * *" because those deductions did not equal the total amount of the transferred funds and were taken at the authorization of the account holder); Salomon v. Nedlloyd, Inc. (In re Black & Geddes, Inc.), 59 B.R. 873, 874 n. 2 (S.D.N.Y. 1986) (holding that the defendant's retention of a commission did not "leave it vulnerable to a preference attack for that amount" because the debtor did not owe the fee to the defendant; the fee was due solely from a third party pursuant to its contract with the defendant; and the third party could have required the defendant to turn over the entirety of the funds to it and then issue its own check to the defendant, but instead simplified the transaction by allowing an offset.)

Since AXA Equitable may only act with respect to any premium payments made on account of the Policy, including the Transfers, and the funds in the Policy Account in accordance with its contractual undertakings under the Policy, it is a mere conduit, not an initial transferee under Section 550(a)(1). Therefore, so much of the bankruptcy court's memorandum decision and

23

order as granted AXA Equitable's motion for summary judgment and dismissed the Trust's claim seeking recovery against AXA Equitable on the basis that it was an "initial transferee" of the Transfers within the meaning of Section 550(a)(1) of the Bankruptcy Code is affirmed.

III.    Conclusion

For the reasons set forth above, (1) the bankruptcy court's decision to deny the Trust's request to delay consideration of the motion for summary judgment to allow it to conduct formal discovery is affirmed; (2) so much of the memorandum decision and order of the bankruptcy court as granted AXA Equitable's motion for summary judgment and dismissed the Trust's claim seeking recovery against AXA Equitable on the basis that it was an "initial transferee" of the Transfers within the meaning of Section 550(a)(1) of the Bankruptcy Code is affirmed; and (2) so much of the memorandum decision and order of the bankruptcy court as *sua sponte* granted summary judgment on AXA Equitable's affirmative defense under 11 U.S.C. § 550(b) and dismissed the Trust's claim seeking recovery against AXA Equitable as an "immediate or mediate transferee of [an] initial transferee" of the Transfers within the meaning of Section 550(a)(2) of the Bankruptcy Code is vacated and remanded with instructions for further proceedings as set forth herein.

**SO ORDERED.**

s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated: September 30, 2014
       Central Islip, New York

24